IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| DWIGHT D. RICE, DDS, an Individual, | ) ) ) | Case No. CV-05-216-S-BLW |
| Plaintiff, | ) ) | **MEMORANDUM DECISION AND ORDER** |
| v. | ) ) | |
| UNION CENTRAL LIFE INSURANCE COMPANY, a Foreign Corporation, | ) ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

## INTRODUCTION

The Court has before it a motion for partial summary judgment and a motion to amend filed by plaintiff Dr. Rice, and a motion for summary judgment filed by defendant Union Central. The Court heard oral argument on December 1, 2006, and made a general ruling from the bench on the motions. This decision will explain those decisions in more detail. For the reasons expressed below, the Court will grant in part both summary judgment motions, dismissing some of Union Central's affirmative defenses and Dr. Rice's bad faith and negligent adjustment claims. The Court will deny Dr. Rice's motion to amend to add punitive damages.

## BACKGROUND FACTS

**Memorandum Decision and Order – Page 1**

Dr. Rice practiced general dentistry under the name of Rice Family Dentistry in Boise until he completed the sale of his practice on November 15, 2004.  He claims that he can no longer practice dentistry because his allergies to workplace substances caused him to suffer eczema on his hands. This disability, he alleges, entitles him to payment under policies of disability insurance issued by Union Central, and he filed this lawsuit to recover under those policies.

Dr. Rice first started receiving medical care for his hand eczema in 1997.  In that same year, on February 28, 1997, Union Central issued a disability insurance policy to Dr. Rice.  That policy contained a Guaranteed Physical Insurability Rider (GPIR) that allowed Dr. Rice to apply for and obtain increases in his benefits without evidence of physical insurability so long as he met financial underwriting standards.  He took advantage of the GPIR to purchase increased benefit policies in 2000, 2003, and 2004.

On August 12, 2003, Dr. Rice was arrested and charged with a felony criminal offense of enticing a child over the Internet in violation of Idaho Code § 18-1509A.  On September 2, 2003, Dr. Rice had his first appointment with Dr. Burr, whose patch tests showed that Dr. Rice was allergic to, among other substances, carbamates, thirams, glutaraldehyde, and formaldehyde releasing agents.

**Memorandum Decision and Order – Page 2**

On November 5, 2003, Dr. Rice was examined by Dr. Frances Storrs, a dermatologist with a specialty in contact dermatitis.  *See Dr. Storrs Deposition* at pp. 4-6.  Her tests confirmed Dr. Burr's tests concerning allergens.  Her physical examination of Dr. Rice found that he had "marked xerosis [abnormal dryness] with fissuring and cracking on the dorsal surfaces of his hands, over the metatarsal surfaces, and some of these areas look like a diminishing dermatitis that could have been vesicular."  *See Exhibit 1 to Dr. Storrs Deposition.*  She concluded that he "had both an irritant and an allergic contact dermatitis."  With regard to his long-term prognosis, she noted that

> [h]e will probably have something of a chronic hand eczema and this is likely to be a problem for him as a dentist.  It is difficult to know what his level of motivation is for hand clearing in order to continue in his job. . . .  I think that you and he will need to decide how much hand eczema he can tolerate in his job.  It is pretty easy to clear him up and during the period of time that he was here we were actually able to pretty well clear his hands using only Vaseline and no topical steroid.  I think with conscientious attention to his hands and allergen avoidance, he should do quite well, but I do not think that he will be entirely clear.

On October 22, 2004, just six days before submitting his claim for total disability to Union Central, Dr. Rice was examined by allergist Dr. John Jeppson.  According to Dr. Jeppson's notes, Dr. Rice complained of "significant problems with a skin rash."  *See Exhibit 1 to Dr. Jeppson Deposition*.  Dr. Jeppson's exam revealed that "[h]e had just slight inflammation on a couple of fingers, really normal findings."  *Id*.  Dr. Jeppson did not observe any blisters, fissuring of the

**Memorandum Decision and Order – Page 3**

skin, open sores, or weeping sores.  *See Dr. Jeppson Deposition* at pp. 8-9.

On October 28, 2004, Dr. Rice submitted his claim to Union Central for total disability arising out of hand dermatitis.  In his Application for Disability Benefits, Dr. Rice explained that he had "contact dermatitis" causing "open weeping wounds on hands."  *See Exhibit 15 to Dr. Rice Deposition*.  Dr. Rice noted on his Application that he would continue to work until November 15, 2004, the date he would close on the sale of his practice.  Indeed, on the date he filed his Application, he also treated 23 patients.  His net income for 2004 was $214,000 – more than twice his net income in 2003.

With his Application, Dr. Rice also submitted an Attending Physician's Statement signed by Dr. Randall Burr.  Dr. Burr states that Dr. Rice is suffering from "severe hand eczema – allergy to latex," and concludes that it will be "very difficult [for Dr. Rice] to perform dentistry practice as gloves are absolutely necessary - latex and other allergies are incapacitating."  *See Exhibit 15* at p. UC/00693.

Dr. Rice did sell his practice in November of 2004.  He left the practice and transferred his dentistry license from active status to retirement status.

Dr. Rice's claim was assigned to claim examiner Shelly Bean.  She went on medical leave and the claim was transferred to Jeffrey Zoz.  About a month after

the claim was filed, Zoz requested that Dr. Rice provide financial information, which was received on December 14, 2004.

On December 22, 2004, Zoz requested that Union Central's medical director, Dr. Robert Frank, review the claim.  He did so, and rendered his report on January 2, 2005.  He noted that "dermatitis is usually treatable."  After reviewing the reports of Drs. Jeppson and Storrs, he doubted that Dr. Rice was disabled, and he suggested an independent medical exam (IME).

That examination was conducted 18 days later on January 20, 2005.  It was conducted by Dr. Warren Miller, an independent Board Certified dermatologist, and he filed his report on January 24, 2005.  Dr. Miller concluded that Dr. Rice was only "partially disabled," and found that "[w]ith motivation and effort on his part, I believe he should be able to find a way to practice his specialty."

On January 28, 2005, Zoz sent a copy of Dr. Miller's report to Dr. Burr for comment.  On February 3, 2005, Dr. Burr responded that "[m]otivation is not in question with Dr. Rice.  He has already attempted to limit or change his pattern of practice without success.  Exposure-free days on Monday and Friday did not help his hand eczema.  I do not agree with Dr. Miller in that Dr. Rice <u>cannot</u> avoid the allergens that are inherent in dental practice . . . .  I believe he is totally disabled and unable to practice his dental sub-specialty."  *See UC/00431* (emphasis in

**Memorandum Decision and Order – Page 5**

original).

On February 18, 2005, Union Central learned for the first time that Dr. Rice had been arrested on the child enticement charges back in August of 2003.  *See Zoz Deposition* at p. 210.  A Union Central field representative, Richard Bonenfant, investigated the criminal proceedings and filed a report in April of 2005.  *See Zoz Affidavit* at ¶ 15, p. 3.[1]

That report noted that the charges had bounced between federal and state prosecutors, and that an arraignment was scheduled for March 2, 2005.  The report also described Bonenfant's interview with Lisa Tucker, an employee of Dr. Rice from 1999 to July of 2004.  Tucker stated, according to the report, that (1) "at the time of her leaving the medical practice [July 2004], [Dr. Rice] was working as though he was going to continue for another 20 years," (2) "Dr. Rice never cancelled appointments due to his hand condition nor did he ever ask appointments to be rescheduled," (3) "[s]he did not see any visible signs of deterioration with regards to his medical condition involving latex allegories [sic] . . . nor did she observe any changes in his medical condition," (4) that while Dr. Rice cut back to three days a week, this was designed to accommodate late

---

[1]  Zoz states in his affidavit that he received the report in April of "2004" which is a typographical error because the report contains material dated as late as March of 2005.

**Memorandum Decision and Order – Page 6**

appointments rather than a disability, and (4) that the employees "were all shocked at the sale of the practice."  *See* UC/00373.

On March 24, 2005, Dr. Rice, through counsel, informed Union Central that he was withdrawing all prior authorizations that allowed Union Central to obtain information from third parties, and would refuse to provide any further information concerning his claim.  *See Zoz Affidavit* at ¶ 17, p. 3.

On April 14, 2005, Zoz requested more information from Dr. Rice's counsel in part "to evaluate if there is any relationship between Dr. Rice stopping work and selling his practice and the criminal proceedings." *See UC/00382-383.*  Dr. Rice did not provide the information, but instead filed this lawsuit on April 28, 2005, against Union Central seeking recovery under the disability insurance policies.  *See Notice of Removal (docket no. 1).*  The complaint was served upon Union Central on May 9, 2005.

On May 27, 2005, Union Central denied Dr. Rice's application for disability benefits.  Union Central based its denial on the following: (1) Dr. Rice has had the eczema condition since 1997 but continued to practice without limitation up to the day he sold his practice; (2) Drs. Miller and Storrs concluded that Dr. Rice could obtain treatment that would allow him to practice in his specialty; (3) Dr. Jeppson reported that the condition of Dr. Rice's hands was normal; (4) the sale of his

practice appears to be more related to the criminal charges than to any disability; and (5) Dr. Rice has refused to cooperate with Union Central's investigation.

On July 28, 2005, Dr. Rice was convicted by a jury of the child enticement charge.  On September 30, 2005, he received a withheld sentence of probation, one of the conditions of which was that he serve a ninety-day jail term.  He has since served that term.

The Board of Dentistry commenced proceedings to determine whether Dr. Rice's license to practice dentistry in Idaho should be revoked.  Those proceedings were resolved by stipulation approved on October 20, 2006.  Dr. Rice agreed to let his retirement status licence "expire on its terms" and not to seek a renewal until his probation was completed.  This agreement "shall not limit or preclude" Dr. Rice from seeking licensure as a dentist in any other state.

## ANALYSIS

### *Dr. Rice's Motion for Summary Judgment*

### 1.    <u>Union Central's Counterclaim</u>

Dr. Rice seeks first to strike Union Central's counterclaim on the ground that it is redundant with its affirmative defenses.  The Court finds that unnecessary as the Court's control of the proceedings will accomplish the result sought by Dr. Rice.

**Memorandum Decision and Order – Page 8**

**2.**   **Union Central's Tenth Affirmative Defense**

Dr. Rice seeks summary judgment on Union Central's Tenth Affirmative Defense alleging that he is legally unable to perform the duties of his occupation and hence suffers a legal disability for which benefits are not available.  At oral argument, in response to the Court's questioning, counsel for Dr. Rice conceded that an issue of fact existed on this claim.  For that reason, the Court will deny this aspect of Dr. Rice's motion.[2]

**3.**   **Union Central's Fourth Affirmative Defense**

Dr. Rice next seeks summary judgment on Union Central's Fourth Affirmative Defense, asserting laches, waiver, and estoppel.  Union Central has apparently withdrawn this Defense and thus the Court will grant this aspect of Dr. Rice's motion.

**4.**   **Union Central's Fifth & Ninth Affirmative Defenses**

Dr. Rice next seeks summary judgment on Union Central's Fifth and Ninth Affirmative Defenses, both of which assert that Dr. Rice's disability is the result of a pre-existing condition excluded by the policies.  The policies contain the following provision governing pre-existing conditions:

---

[2]  Dr. Rice agrees that he is not entitled to benefits for the 90 days he spent in jail.  While the parties argued in the briefing over whether evidence of this is admissible under Rule 403, there is no motion in limine before the Court, and the Court will therefore not express any opinion on the issue at this time.

**Memorandum Decision and Order – Page 9**

> If a disability is caused by a pre-existing condition, we will pay no benefit unless:
> 1.      Disability starts two years after the Issue Date; or
> 2.      The pre-existing condition was disclosed in the application and not excluded from coverage by name or specific description.

The term "Issue Date" is defined as the date that is "stated as the Issue Date on page 1." That date is February 28, 1997. Thus, Dr. Rice is entitled to benefits for a disability caused by a condition existing before February 28, 1997, so long as his disability does not start before February 28, 1999. There is no dispute that Dr. Rice has satisfied this provision because his disability did not start until 2004.

The real dispute is over the two additional policies that Dr. Rice purchased in 2003 and 2004.[3] He purchased these pursuant to a rider contained in his 1997 policy. This rider – known as the Guaranteed Physical Insurability Rider (GPIR) – entitled Dr. Rice to apply for and purchase increased monthly disability benefits without providing evidence of physical insurability, *i.e.*, additional medical information. The 1997 GPIR states as follows:

> This rider takes effect on the Policy Date unless a different Rider Date of Issue is shown on page 1. As applied to this rider, the incontestability and pre-existing conditions provisions will be measured from the later of:
> 1.      The Policy Date; or
> 2.      The Rider Date of Issue.

---

[3] Union Central is not arguing that the pre-existing condition exclusion applies to Dr. Rice's application for benefits from the 1997 and 2000 policies.

**Memorandum Decision and Order – Page 10**

This language is ambiguous.  One reasonable interpretation is that the "Policy Date" refers to the 1997 Policy Date of the original policy, which becomes the trigger date for all subsequent policies issued under the GPIR.  That is not entirely clear, however, because the 2003 and 2004 policies in this case have their own pre-existing conditions exclusion clauses.

Whether an insurance policy is ambiguous is a question of law.  *Purdy v. Farmers Ins. Co. of Idaho*, 444, 65 P.3d 184, 185 (Id.Sup.Ct. 2003).  A policy provision is ambiguous if it is reasonably subject to differing interpretations.  *Id.*  The Court finds as a matter of law that the pre-existing condition language in the GPIR and the 2003 and 2004 policies is ambiguous.

Ambiguities will be resolved against the insurer.  *Howard v. Oregon Mut. Ins. Co.,* 46 P.3d 510, 513-14 (Id.Sup.Ct. 2002).  This is so because insurance contracts are adhesion contracts which do not allow for equal bargaining between the parties. *Id.*  In this case, construing the ambiguity against Union Central, the Court concludes that the trigger date for the pre-existing condition exclusion for the 2003 and 2004 policies is the original Policy Date of 1997.   For that reason, the Court will grant Dr. Rice's motion for summary judgment on the Fifth and Ninth Affirmative Defenses.

### *Union Central's Motion for Summary Judgment*

**Memorandum Decision and Order – Page 11**

1.   <u>**Bad Faith**</u>

Dr. Rice claims that Union Central has acted in bad faith in (1) delaying its decision on his application for benefits, and (2) denying his benefits. Union Central has moved for summary judgment, contending that no evidence supports this claim.

To prove this claim, Dr. Rice must show that (1) Union Central intentionally and unreasonably denied or withheld payment; (2) the claim was not fairly debatable; (3) the denial or failure to pay was not the result of a good faith mistake; and (4) the resulting harm is not fully compensable by contract damages. *White v. Unigard Mut. Ins. Co*., 730 P.2d 1014 (Id.Sup.Ct. 1986). The Idaho Supreme Court has acknowledged that "an insurer is not acting in bad faith if it challenges the validity of a "fairly debatable claim" and that "good faith and fair dealing with an insured does not include the payment of sums that are reasonably in dispute . . . ." *Roper v. State Farm Mutual Automobile Insurance Co.,* 958 P.2d 1145 (Id.Sup.Ct. 1998) (quoting *Anderson v. Farmers Ins. Co. of Idaho*, 947 P.2d 1003, 1007 (Id.Sup.Ct. 1997)).

In *Roper*, plaintiff Charles Roper claimed to suffer injuries in an auto accident. While several physicians "determined various causes for Roper's existing condition," an IME panel concluded that his condition was "no more than

a temporary aggravation of preexisting conditions." *Id*. at 1146.  Roper's insurer

denied his claim, and Roper responded by filing a bad faith action.  The lower

court granted summary judgment for the insurer.  On appeal, the Idaho Supreme

Court affirmed: "Considering the complex medical details of these claims and the

differing responses by the numerous doctors involved, it is evident these claims

were 'fairly debatable.'" *Id*. at 1148.

That analysis applies here.  While Dr. Burr concluded that Dr. Rice's

condition was not subject to improvement, Drs. Storrs and Miller concluded just

the opposite.  While Dr. Burr concluded that Dr. Rice could not continue to

practice, Drs. Storrs and Miller concluded just the opposite.  While Dr. Burr is the

treating physician, Dr. Miller is a Board-certified dermatologist and Dr. Storrs is a

leading specialist in contact dermatitis.  While Dr. Rice claimed in his Application

for Benefits that his condition prevented him from practicing, Dr. Jeppson's

examination – conducted just six days earlier – revealed "normal findings"

regarding his hands.  While Dr. Rice claims that he had to sell his practice because

his condition prevented him from practicing, he worked continuously up to the day

he sold his practice, and his own employees never saw any limitation and were

shocked when he decided to sell his practice.

This is the evidence that Union Central had before it when it denied Dr.

**Memorandum Decision and Order – Page 13**

Rice's claim.  Each piece of evidence favoring Dr. Rice is matched with contrary evidence.  From this, only one conclusion can be reasonably drawn – that Dr. Rice's claim is fairly debatable.  No reasonable juror could conclude otherwise.  Just as in *Roper*, the "differing responses by the numerous doctors involved" render the claim "fairly debatable."  *Id*.  Thus, Union Central's decision denying benefits to Dr. Rice cannot, as a matter of law, support a bad faith claim.

As noted above, Dr. Rice also asserts that Union Central's delays in reaching its decision constitute a separate ground for a bad faith claim.  The Idaho Supreme Court has held that "even if an investigation could have been completed more expeditiously, there was no bad faith unless the company delayed, intending to achieve delay for delay's sake."  *Id*. at 1148.

Dr. Rice asserts that there is at least a question of fact over whether "Union Central tried to delay reaching a claims decision in the hope that Dr. Rice would lose his license to practice dentistry and justify a denial of benefits."  *See Dr. Rice's Response Brief* at p. 14.  Union Central discovered on February 18, 2005, that Dr. Rice had earlier been arrested on the child enticement charge.  This date – February 18, 2005 – would have to be the starting date for evaluating Dr. Rice's theory that Union Central promoted delay in the hope that the criminal proceedings would strip Dr. Rice of his license.

**Memorandum Decision and Order – Page 14**

There are 15 weeks between February 18, 2005, and the date that Union Central denied the claim on May 27, 2005.  Obviously the discovery of Dr. Rice's arrest required further investigation, and that was promptly undertaken by Bonenfant, who delivered his report about six weeks later.

By mid-March, Dr. Rice was refusing to cooperate, and he filed suit in late April.  Given these four factors – the discovery of the arrest, the prompt investigation, the lack of cooperation, and the filing of the suit – no reasonable juror could find that the 15 week delay was an act of bad faith.

Dr. Rice responds with a broader claim, contending that the 200 day delay from the date he filed his application (October 28, 2004) to the date of denial (May 27, 2005) raises an issue of fact on his bad faith claim.  There was initially a two month delay before Union Central's medical director (Dr. Franks) reviewed the claim, resulting in part because the original claims examiner took a medical leave of absence.  While the claim could have been processed more expeditiously, this delay raises no bad faith issue.  Recall that at this point, Union Central did not know about the arrest, and thus could not have been promoting delay in the hope that the criminal process would strip Dr. Rice of his license.

From that point onward, the claim was processed expeditiously.  An IME was held within a month of Dr. Frank's review.  That review did not favor Dr.

Rice, and required Union Central to do more investigation, which it promptly undertook.

More investigation was required once Union Central discovered, in mid-February, 2005, Dr. Rice's earlier arrest.  Within a month, Union Central had the results of Bonenfant's investigation, and they requested more information from Dr. Rice to determine if the sale of his business was connected to the criminal charges.  However, by mid-March of 2005, Dr. Rice was not providing any further information.

At this point only five months had passed since Dr. Rice filed his claim. Further delays from that point until the claim was ultimately denied were obviously affected by Dr. Rice's own conduct in refusing to provide information and then in filing this lawsuit.  Earlier delays were due largely to events beyond Union Central's control, such as the negative reports by Drs. Miller and Storrs, and the discovery of criminal charges against Dr. Rice.  No reasonable juror, looking at this chronology, could reasonably conclude that Union Central was delaying for delay's sake.  Consequently, the Court will grant summary judgment on this aspect of Dr. Rice's bad faith claim as well.

## 2.   **Breach of Contract**

Union Central seeks summary judgment on Dr. Rice's breach of contract

claim because "[t]he overwhelming medical opinion [including Drs. Storrs & Miller] shows that Dr. Rice is not disabled by his allergy, and certainly not "totally" disabled by any sickness." *See Union Central Brief* at p. 15. The evidence that Dr. Rice was not disabled is substantial, but not wholly one-sided. Dr. Rice has raised questions of fact on the issue of his total disability by offering the opinion of Dr. Barr, his treating physician, who concludes that Dr. Rice is unable to control his dermatitis and hence unable to continue his practice. While other physicians disagree, Dr. Barr's testimony at least creates an issue of fact that cannot be resolved on summary judgment.

### 3.    <u>Negligent Adjustment</u>

Union Central seeks summary judgment on Dr. Rice's claim that Union Central breached its duty of care by negligently failing to tender a timely settlement to him following the submission of his application for disability benefits. The Idaho Supreme Court has limited this cause of action to "cases where an insurer negligently denies or delays payment of an insurance claim." *Selkirk Seed Co. v. State Insurance Fund*, 22 P.3d 1028, 1032 (Idaho 2001). There is no evidence that Union Central was negligent in denying Dr. Rice's claim – no evidence that its denial was based on carelessness or mistake. Moreover, as discussed earlier, any delay beyond the insignificant two month delay at the

beginning of the process was due to conflicting reports from physicians and the discovery of criminal charges rather than any negligence on the part of Union Central.

Dr. Rice argues that issues of fact are raised by the "slipshod and incompetent" manner in which Union Central handled the claim. *See Dr. Rice's Response Brief* at p. 18. Dr. Rice points to the "empty promises" made by Union Central's representatives in response to Dr. Rice's calls for status reports, and by Dr. Frank's ignorance of (1) the existence of multiple policies, (2) certain provisions in those policies, and (3) the requirements of Dr. Rice's practice. *Id.* These matters are all irrelevant to this claim, however. With regard to the delays, there was no delay caused by Union Central's conduct after the insignificant two month delay at the beginning of the claims process. With regard to the denial, Union Central based its denial on the reports of physicians and former employees, and there is no evidence whatsoever that these reports are the product of a "slipshod and incompetent" process. The Court will therefore grant summary judgment as to this claim as well.

### Dr. Rice's Motion To Amend To Add Punitive Damages

Dr. Rice seeks to amend his complaint to add a claim for punitive damages. To be entitled to amend, Dr. Rice must establish "a reasonable likelihood of

proving facts at trial sufficient to support an award of punitive damages." *See* Idaho Code § 6-1604(2).  Punitive damages are warranted when "the defendant acted with an extremely harmful state of mind, whether that be termed 'malice, oppression, fraud, or gross negligence;' 'malice, oppression, wantonness;' or simply 'deliberate and willful.'" *Gen. Auto Parts Co., Inc. v. Genuine Parts Co.,* 979 P.2d 1207, 1211 (Idaho 1999).

In Idaho, punitive damages are not limited to tort cases.  "It is not the nature of the case, whether tort or contract, that controls the issue of punitive damages. The issue revolves around whether the plaintiff is able to establish the requisite intersection of two factors: a bad act and a bad state of mind." *Myers v. Workmen's Auto Ins.Co.,* 95 P.3d 977, 985 (Id.Sup.Ct. 2004).  The Idaho courts have further explained that in contract cases, "[i]f a party breaches its duty to act in good faith, it may be liable for not only the usual damages resulting from the breach, but also punitive damages." *Cuddy Mountain Concrete, Inc. v. Citadel Constr., Inc.,* 824 P.2d 151, 160 (Idaho Ct. App. 1992).  The *Cuddy Mountain* decision concluded that a punitive damage award in contract cases must be based on "conduct which is unreasonable and irrational in the business context." *Id.*

At trial, Dr. Rice must satisfy this standard by clear and convincing evidence. *See* Idaho Code § 6-1604(1).  For purposes of this motion to amend,

however, Dr. Rice does not need to meet this high burden – he need show only "a reasonable likelihood of proving facts at trial sufficient to support an award of punitive damages."  *See* Idaho Code § 6-1604(2).

Dr. Rice argues first that Union Central committed a clear and unjustified breach of the insurance contracts by relying on the pre-existing conditions exclusion and the misrepresentation exclusion to deny benefits.  While Union Central did rely on these grounds, it also relied on the ground that Dr. Rice had no total disability, a ground the Court has found above is "fairly debatable."

Importantly, this fairly debatable ground for denying coverage stands on its own, and does not rely on the misrepresentation and pre-existing condition justifications.  Dr. Rice offers no authority holding that punitive damages can be imposed on an insurer who relied on a fairly debatable reason for denying benefits merely because the insurer also relied on additional and completely independent reasons for denial that were far weaker.  This kitchen-sink approach – so prevalent in, for example, attorneys' pleadings – cannot be deemed outrageous conduct.

Dr. Rice argues next that Union Central violated its own policy to follow the California Fair Claims Settlement Practices Act.  That Act, Dr. Rice asserts, requires that insurers either grant or deny an application for benefits within 40 days.

**Memorandum Decision and Order – Page 20**

To support his argument that Union Central has a policy of following the California Act, Dr. Rice cites to page 139 of Zoz's deposition.  There Zoz states that "we would generally follow California being that California is usually the – I don't know what the word – most strict guidelines or practices.  And in most cases, California would cover a lot of the other states."  *See Zoz Deposition* at p. 139.[4] This vague statement certainly does not establish a Union Central corporate policy requiring a decision within 40 days.  Dr. Rice submits nothing else to the Court indicating that Union Central has a corporate policy requiring a decision within 40 days.

Dr. Rice also alleges that Union Central violated the Idaho law requiring insurers to "affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed."  *See* Idaho Code § 41-1329(5).  Based on the discussion above, no reasonable juror could find that Union Central violated this provision.  Certainly there was no violation that warrants the award of punitive damages.

After considering all of Dr. Rice's arguments, the Court cannot find that he has carried his burden of showing a reasonable likelihood of proving punitive

---

[4] Later in the deposition, Zoz is asked whether "you follow the guidelines set forth under the California digest prepared by Union Central," and he answers, "[g]enerally speaking, yes." *See Zoz Deposition* at p. 140.  In his briefing, Dr. Rice does not discuss this "California digest" or identify it in the record for the Court's review.

**Memorandum Decision and Order – Page 21**

damages at trial.  For this reason, the Court will deny Dr. Rice's motion to amend to add a claim for punitive damages.

## ORDER

In accordance with the terms of the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that Dr. Rice's motion for partial summary judgment (Docket No. 42) is GRANTED IN PART AND DENIED IN PART.  The motion is granted to the extent it seeks to dismiss Union Central's Fourth, Fifth, and Ninth Affirmative Defenses.  It is denied in all other respects.

IT IS FURTHER ORDERED, that Union Central's motion for summary judgment (Docket No. 47) is GRANTED IN PART AND DENIED IN PART.  The motion is granted to the extent it seeks to dismiss the bad faith and negligent adjustment claims of Dr. Rice.  It is denied in all other respects.

IT IS FURTHER ORDERED, that the motion to amend (Docket No. 58) is DENIED.

IT IS FURTHER ORDERED, that the motion to supplement (Docket No. 78) is GRANTED.

IT IS FURTHER ORDERED, that counsel shall immediately contact the

Court's Clerk LaDonna Garcia (208-334-9021) to set this case for trial.



DATED:  **December 6, 2006**

Honorable B. Lynn Winmill
Chief U. S. District Judge

**Memorandum Decision and Order – Page 23**